IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **MEDICALINCS, LLC,** | * | |
| **Plaintiff,** | * | |
| v. | * | Civ. No. JKB-23-1937 |
| **COORDINATING CENTER FOR HOME AND COMMUNITY CARE, INC.,** | * | |
| | * | |
| **Defendant.** | * | |

\* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Pending before the Court is Plaintiff Medicalincs, LLC's ("Medicalincs") Emergency Motion for Temporary Restraining Order and for Preliminary Injunction (the "Motion"). (ECF No. 4.) The Court held a Hearing on August 4, 2023, at which Medicalincs and Defendant Coordinating Center for Home and Community Care, Inc. ("CCHC") were present. Plaintiff's Motion will be denied.

### I.  *Factual and Procedural Background*

Medicalincs is Minority Business Enterprise ("MBE") specializing in healthcare advisory and management services. (Compl. ¶ 4, ECF No. 1.) CCHC provides care coordinating services. (*Id.* ¶ 5–6.) On December 6, 2019, the Maryland Department of Health Division of Children's Services ("MDH") awarded CCHC a contract to administer its Rare and Expensive Case Management Program ("REM"). (*Id.* ¶ 8.) MDH required CCHC to subcontract 10% of its case management services on an annual basis to one or more MBEs. (*Id.* ¶ 9.)

On January 2, 2020, CCHC entered into a subcontracting agreement with Medicalincs to perform case management services (the "Subcontract"). (*Id.* ¶ 10.) The Subcontract provides that

1

it "shall be for a period of three (3) years. Upon successful completion of [the] period of performance, Contractor may renew this Subcontract for up to two (2) one-year option periods." (Subcontract ¶ 3.1, Mot. Ex. 1, ECF No. 4-3.) It also provides that it "may be modified by mutual agreement of the parties, provided: (a) the modification is made in writing; and (b) all parties sign the modification." (*Id.* ¶ 2.2.)

In reliance on the Subcontract and other contacts, Medicalincs signed a five-year lease and hired several staff. (Compl. ¶¶ 16–17.) The allegations make clear that Medicalincs had some difficulties with its performance, although such issues are not clear from the Complaint or briefing currently before the Court. (*See id.* ¶ 20 (Medicalincs alleging that it "chose to temporarily give up some client care delivery to [CCHC] to maintain client care delivery and quality (over revenue gain); and focus on rehiring"); *id.* ¶ 23 ("Despite demonstration of ongoing efforts, CCHC still [ ] placed Medicalincs on corrective actions in the interim, following feedback and requests to temporarily take on client care delivery.").)

On December 27, 2022, CCHC sent Medicalincs a letter explaining that the State of Maryland renewed its contract with CCHC for the period of March 1, 2023 to February 29, 2024 and that "[i]f the Plan of correction submitted by Medicalincs is deemed satisfactory to [CCHC] with demonstrated improvement within 30 days, [CCHC] intends to continue the current subcontract for the same period." (*Id.* ¶ 25.)

Medicalincs sent CCHC plans of correction on January 5 and 17, 2023. (*Id.* ¶¶ 26–27.) Medicalincs alleges that "[i]n reliance on the extension of its contract to February 29, 2024, and consistent with CCHC feedback of January 17, 2023, Medicalincs maintained its full staff supporting REM to ensure that the action plan in place was successfully executed." (*Id.* ¶ 28.) Medicalincs does not explain what this January 17, 2023 feedback was.

2

On February 6, 2023, CCHC emailed Medicalincs to renew the Subcontract for a six-month period. (*Id.* ¶ 30.) CCHC allegedly refused to meet with Medicalincs regarding this renewal. (*Id.*) On February 14, 2023, CCHC emailed Medicalincs citing to Paragraph 3.1 of the Subcontract— which provided for the three-year term and that CCHC "may renew th[e] Subcontract for up to two (2) one-year option periods." (*Id.*) CCHC explained that it was "proposing a new option period with regard to a non-mandatory renewal term" given that "Medicalincs ha[d] not fully successfully completed the most recent period of performance (base year three)[.]" (*Id.*) The six-month period would run from March 1, 2023 through August 31, 2023. (*Id.*)

On February 16, 2023, CCHC sent Medicalincs a letter that reiterated much of the above communication. (*Id.* ¶ 31.) CCHC explained that the initial period of performance (i.e., the three-year period) would end on February 28, 2023, that CCHC sought to renew the Subcontract for a six months, and that, "[u]pon successful completion of this period of performance (to include all corrective actions identified via letter of concern in December 2022), [CCHC] may renew this Subcontract every six months." (*Id.*) The letter included the following language: "In WITNESS WHEREOF, the parties acknowledge continuation of Subcontractor Agreement" along with signature lines for CCHC and Medicalincs. (ECF No. 4-4.) CCHC and Medicalincs signed the letter on February 16, 2023. (*Id.*) Medicalincs alleges that it thereafter "continued to perform successfully and satisfactorily as required and without any concern from [CCHC]." (Compl. ¶ 33.)

On July 5, 2023, CCHC sent Medicalincs a "Notice of Contract Non-renewal," explaining that the Subcontract would not be renewed, and that it would "terminate at the end of the current six-month term as scheduled on August 31, 2023." (*Id.* ¶ 34.) Medicalincs explains that it was "[s]tunned by the notice" and followed up, to which CCHC responded that "the purpose of the 'Notice of Contract Non-renewal' dated July 5, 2023, was not to state TCC's 'intention to

terminate the agreement' with Medicalincs. The Agreement by its own terms is already scheduled to expire on August 31, 2023, and no further action on the part of [CCHC] is necessary to effect the expiration." (*Id.* ¶ 35.) CCHC then sent notice to Medicalincs' clients, informing them that Grant Global would be the new subcontractor beginning on September 1, 2023. (*Id.* ¶ 37.)

Medicalincs also alleges that "[f]rom the inception of the agreement, and throughout the execution of the agreement, Medicalincs was subjected to unwarranted discrimination" and that "Medicalincs' race has always been a problem in the making, execution, and most certainly, termination of the subcontract agreement with [CCHC]." (*Id.* ¶¶ 47, 57.)

Medicalincs filed its Complaint on July 20, 2023 bringing claims relating to breach of contract and 42 U.S.C. § 1981. (*See generally id.*) Medicalincs filed a Motion for Temporary Restraining Order and Preliminary Injunction on July 28, 2023. (ECF No. 4.) In its Motion, Medicalincs essentially seeks that the Court enjoin CCHC's contract with Grant Global and prevent CCHC from terminating the Subcontract "before [its] natural expiration . . . , that is February 29, 2024[.]" (*Id.*) CCHC filed a response on August 3, 2023. (ECF No. 6.) The Court held a Hearing on the Motion on August 4, 2023.

## II. Legal Standard

A party may seek a temporary restraining order or preliminary injunction pursuant to Federal Rule of Civil Procedure 65. A party seeking a such relief must show that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *see also Maages Auditorium v. Prince George's Cty., Md.*, 4 F. Supp. 3d 752, 760 n.1 (D. Md. 2014) (noting that the standard for a temporary restraining order is the same as for a preliminary injunction), *aff'd*, 681 Fed. App'x 256 (4th Cir. 2017). All four

factors must be established to grant relief. *See Henderson for Nat'l Lab. Rels. Bd. v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018) (explaining that a district court need not "mechanically consider all four *Winter* factors if one is clearly absent").

"The grant of a TRO or a preliminary injunction is an 'extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Fowler v. Wells Fargo Home Mortg., Inc.*, Civ. No. GJH-15-1084, 2015 WL 2342377, at *2 (D. Md. May 13, 2015) (quoting *Dewhurst*, 649 F.3d at 290).

## III. Analysis

Medicalincs is unlikely to succeed on the merits with respect to its breach of contract and 42 U.S.C. § 1981 claims, and therefore fails to establish the first *Winter* factor. Its Motion will be denied on this basis with respect to both a temporary restraining order and preliminary injunction. Further, the Court doubts that Medicalincs has established the remaining *Winter* factors.

### A. Plaintiff's Likelihood of Success on the Merits

#### 1. Breach of Contract Claim

The Subcontract gives CCHC the sole discretion to extend the contract beyond the initial three-year period. The contract explains that "*[u]pon successful completion* of period of performance, Contractor *may* renew this Subcontract for *up to* two (2) one-year options." (Subcontract ¶ 3.1.) This contract language plainly does not require CCHC to extend the Subcontract at all. *See Brodsky v. Brodsky*, 570 A.2d 1235, 1237 (Md. 1990) ("The word 'may' is generally understood as permissive, as opposed to mandatory, language.").

Here, CCHC determined, at the end of the initial three-year term, to extend the Subcontract by six months, to August 31, 2023. Although Medicalincs argues that CCHC extended the contract through February 2024, CCHC did not do so. Rather, CCHC explained on December 27, 2022—

near the end of the three-year term—that "*[i]f the Plan of correction submitted by Medicalincs is deemed satisfactory to the Center* with demonstrated improvement within 30 days, The Center *intends* to continue the current subcontract [through February 29, 2024]." (Compl. ¶ 25 (emphasis added).) Nothing in that statement actually extended the Subcontract through February 2024.

Further, after Medicalincs sent CCHC its plans of correction in January 2023, CCHC explained in various communications in February 2023 that it would extend the contract for six months. In its February 16, 2023 letter, CCHC explained that it sought to renew the Subcontract for six months and that, "[u]pon successful completion of this period of performance (to include all corrective actions identified via letter of concern in December 2022), [CCHC] *may renew* this Subcontract every six months." (*Id.* ¶ 31 (emphasis added).) Accordingly, the only effective extension of the Subcontract was the six-month period through August 2023.

Additionally, to the extent that CCHC did not have the authority to extend the contract by six months given the language in the Subcontract that CCHC could "renew th[e] Subcontract for up to two (2) *one-year* options" (Subcontract ¶ 3.1 (emphasis added))—a dubious argument—the Subcontract provides that it "may be modified by mutual agreement of the parties, provided: (a) the modification is made in writing; and (b) all parties sign the modification." (Subcontract ¶ 2.2.) The February 16, 2023 letter complies with these requirements: it is in writing and signed by the President/CEO of CCHC and of Medicalincs on February 16, 2023.[1] (ECF No. 4-4.)

At the Hearing, Medicalincs explained that it detrimentally relied on statements by CCHC and pointed to the December 27, 2022 communication from CCHC. However, under Maryland

---

[1] Medicalincs states in its Motion that "[t]he letter requested Medicalincs to *acknowledge receipt of the letter*, which it did by having its CEO sign the same day the letter was written." (ECF No. 4-1 at 5 (emphasis added).) This is not true. The letter does not include an acknowledgment of receipt, but rather includes: "In WITNESS WHEREOF, the parties acknowledge continuation of Subcontractor Agreement and Modification No. 2" along with signature lines for CCHC and Medicalincs. (ECF No. 4-4.)

6

law, detrimental reliance requires, *inter alia*, "a clear and definite promise" and "reasonable action or forbearance by the promisee." *Pavel Enterprises, Inc. v. A.S. Johnson Co.*, 674 A.2d 521, 532 (Md. 1996). The December 27, 2022 communication did not include any clear and definite promise. Rather, CHCC explained that "*[i]f the Plan of correction submitted by Medicalincs is deemed satisfactory* to the Center with demonstrated improvement within 30 days, The Center *intends* to continue the current subcontract [through February 29, 2024]." (Compl. ¶ 25 (emphasis added).) This is a far cry from a clear and definite promise. Further, given the vague and caveated nature of this statement, any reliance on it was not reasonable.

Accordingly, Medicalincs has not demonstrated that it is likely to succeed on its breach of contract claim.

### 2. 42 U.S.C. § 1981 Claim

Medicalincs only references its 42 U.S.C. § 1981 claim in passing in its Motion and did not present any argument relating to that claim during the Hearing. However, the Court will address it briefly.

"Section 1981 establishes that '[a]ll persons . . . have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens.'" *Denny v. Elizabeth Arden Salons, Inc.*, 456 F.3d 427, 434 (4th Cir. 2006) (quoting 42 U.S.C. § 1981(a)). "To state a cause of action in a § 1981 action" not involving employment, "a plaintiff must show: (1) [the plaintiff] . . . is a member of a racial minority; (2) the defendant intended to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities protected by the statute." *Buchanan v. Consol. Stores Corp.*, 125 F. Supp. 2d 730, 734 (D. Md. 2001).

Medicalincs alleges that it is Black-owned with mostly Black employees and makes sweeping allegations including that "Medicalincs was subjected to unwarranted discrimination"

7

and that "Medicalincs' race has always been a problem in the making, execution, and most certainly, termination of the [Subcontract]." (Compl. ¶¶ 47, 57.) However, Medicalincs provides only very vague statements in support of these contentions, none of which are tethered to race, such as "[CCHC] took the position that Medicalincs' employees were not good or qualified enough to manage the REM Program and coordinate the needed care for the clients" and "[CCHC] firmly requested Medicalincs to change language on its website from 'Medicalincs in partnership with [CCHC]' to 'Medicalincs is a subcontractor to [CCHC.]'"[2] (Compl. ¶¶ 48, 54.)

These allegations would not pass muster in the Rule 12(b)(6) context, and they likewise do not support the imposition of the extraordinary remedy of a temporary restraining order or preliminary injunction. *Allstate Ins. Co. v. Warns*, Civ. No. CCB-11-1846, 2012 WL 681792, at *14 (D. Md. Feb. 29, 2012) ("[T]he standard of plausibility under *Twombly* and *Iqbal* is not as rigorous as the standard of 'likely to succeed on the merits' required under *Winter*.").

Accordingly, the Court finds that Medicalincs fails to establish the first factor under *Winter*, that it is likely to succeed on the merits. This is dispositive, and Medicalincs' Motion must be denied on this basis. As discussed in more detail below, the Court also doubts that Medicalincs has established the remaining *Winter* factors.

### B. Plaintiff's Likelihood of Irreparable Harm

Medicalincs explains that it will suffer irreparable harm in the form of $1.6 million in losses and employee terminations, which would expose Medicalincs "to potential employment claims" and which would cause hardship for the employees. (ECF No. 4-1 at 9.)

---

[2] With respect to this latter allegation, the Subcontract language itself states: "Subcontractor is an independent subcontractor of Contractor. Subcontractor is not an employee, servant, partner or joint venturer with Contractor." (Subcontract ¶ 30.3.)

The purported $1.6 million[3] in losses does not provide a sufficient basis for granting the extraordinary remedy of a temporary restraining order or preliminary injunction. The Fourth Circuit has explained that:

> [W]hen anticipated economic losses will be recoverable at the end of litigation, then those losses generally will not qualify as irreparable for purposes of preliminary relief. That makes perfect sense: By definition, a temporary loss is not irreparable. Only when a temporary delay in recovery somehow translates to permanent injury—threatening a party's very existence by, for instance, driving it out of business before litigation concludes—could it qualify as irreparable. But otherwise, financial losses that can be recovered by a prevailing party at the close of litigation ordinarily will not justify preliminary relief.

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 218 (4th Cir. 2019) (citations omitted). Medicalincs explains that $1.6 million is 35% of its annual revenue and that "such a drastic and sudden decrease in revenue will threaten its ability to maintain its business sustainably and its contributions to the economy and job opportunities within its community." (ECF No. 4-1 at 11.) The Court does not doubt that such a large drop in revenue will impact Medicalincs' business, but Medicalincs does not set forth evidence that the loss will "threaten its very existence."

With respect to the terminations, while there is some merit to the argument that denying the Motion may cause Medicalincs to have to lay off its employees and that such harm could be irreparable, this factor does not tip strongly in Medicalincs' favor.

First—although Medicalincs does not raise this fact in its Motion—it explained in its Complaint that "[CCHC] immediately offered as solution, to have current Medicalincs' employees

---

[3] The $1.6 million appears to overstate Medicalincs' anticipated losses. This amount accounts not only for a contract extension from September 2023 through February 2024, but also through February 2025. (*See* ECF No. 4-6 ("The unexpected termination of the contract . . . will cost Medicalincs approximately $1.6 Million over the reminder [sic] of the term of the entire contract (with the State approving the 2 options years of the contract) – which amounts to about 35% of Medicalincs annual revenue.").) It is completely speculative to assume that Medicalincs would have gotten the maximum extension of the contract (i.e., two full years after the initial three-year period).

moved to the new subcontractor—Grant Global—and continue to provide the same care to the clients so the clients would not have to deal with new faces." (Compl. ¶ 43.)[4] Therefore, it is not actually clear whether the employees would be without employment.

Second, Medicalincs' failure to act diligently lessens the strength of its argument. Here, Medicalincs knew that CCHC had the option of renewing (or not renewing) the Subcontract after the initial three-year period and that any revenue beyond that initial period was never certain. It therefore should have structured its staffing in a way that accounted for this fact. Further, to the extent Medicalincs hired additional staff after CCHC notified Medicalincs that it was extending the Subcontract in six-month increments, Medicalincs must bear some responsibility for making such a choice when CCHC made it clear that it was not committing to a year-long extension.

## C. Balance of Equities

Medicalincs argues that "G[r]ant Global or [CCHC] will suffer no harm or prejudice at all if the requested injunctive relief is Granted." (ECF No. 4-1 at 10.) This is simply not so. Grant Global would not be able to perform the contract and CCHC would not have its chosen subcontractor (and may be liable to Grant Global if it rescinds any contract with it).

## D. Public Interest

Medicalincs argues that a preliminary injunction is in the public's interest. In particular, it argues that (1) patients have complained about the change in care coordinators; (2) Medicalincs will be forced to lay off at least 10 employees, and "these employees will likely file unemployment

---

[4] In its Complaint, Medicalincs contends that this violates ¶ 11 of the Subcontract, (Compl. ¶ 78), but that paragraph provides that "No employee of the Contractor (or Subcontractor) whose duties as such employee include matters relating to or affecting the subject matter of this Subcontract, shall, during the pendency and term of this Subcontract, and for one (1) year after termination, cancellation, or expiration, and while serving as an employee of the Contractor, become or be an employee of the Subcontractor on this Subcontract, unless approved by the Contractor (or Subcontractor) in a signed writing." (Subcontract ¶ 11.1.) It is not clear why this would apply to employees from Medicalincs seeking employment at Grant Global.

10

claims with the State and or, some may bring civil actions against Medicalincs directly"; and (3) Medicalincs will lose 35% of its revenue, which will "threaten its ability to maintain its business sustainably and its contributions to the economy and job opportunities within its community." (ECF No. 4-1 at 11.)

With respect to the first argument, while it may be inconvenient for a patient to have a new care provider, there is no indication that patient care will be compromised. The other two considerations are more properly considered in the discussion regarding irreparable harm, as discussed above. Accordingly, Medicalincs has not shown that the public interest weighs in favor of a temporary restraining order.

## IV. Conclusion

For the foregoing reasons, the Court will deny Medicalincs' Motion. Its request for a temporary restraining order and for a preliminary injunction are denied.

DATED this ___9___ day of August, 2023.

BY THE COURT:

_/s/ James K. Bredar_
James K. Bredar
Chief Judge